**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **REEVES CONSTRUCTION COMPANY,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:16-cv-00329-TES** |
| **HAYWARD INDUSTRIES, INC., and DIACOM CORPORATION,** | |
| *Defendants.* | |

## ORDER GRANTING HAYWARD'S MOTION FOR SUMMARY JUDGMENT

The Court previously granted Defendant Diacom Corporation's Motion for Summary Judgment, [Doc. 98], such that the only remaining claims are against Defendant Hayward Industries, Inc. ("Hayward"). Hayward moves the Court to grant summary judgment on the claims against it [Doc. 57] and to exclude the expert testimony of Dr. Fredrick Willard [Doc. 58]. For the reasons that follow, Hayward's Motion for Summary Judgment [Doc. 57] is **GRANTED**, and its Motion in Limine [Docs. 58] is **DENIED as moot**.

## FACTUAL BACKGROUND

In 2008, Plaintiff ordered an MP-10S 75tph Asphalt Emulsion System, Continuous Injection Process machine ("CIP") from non-party Dalworth Machine Products ("Dalworth") to be used in manufacturing asphalt paving and other materials. [Doc. 1,

¶¶ 6–8; Doc. 69-1, ¶¶ 1, 4]. The CIP included an acid system that supplied hydrochloric acid for use in manufacturing the asphalt products. [*Id.* at ¶ 4; Burdette Depo., pp. 30:7–16, 34:12–21]. Prior to Plaintiff using the CIP, Dalworth installed a gauge guard manufactured by Hayward and distributed to Dalworth by non-party Wipco, which was used to protect the CIP's pressure gauge from corrosive or otherwise damaging fluids. [Doc. 69-1, ¶¶ 10, 11; Doc. 83, ¶ 10, 12]. A component part of the gauge guard was a diaphragm manufactured by Diacom and composed of Viton, a fluoropolymer. [Doc. 83, ¶¶ 12, 20]. The gauge guard is depicted below with the diaphragm labeled as "4. FPM Membrane."



Figure 1. Schematic of Hayward gauge guard.[2]

On June 2, 2014, the Viton diaphragm failed due to hydrogen chloride (i.e., the gaseous form of undissolved hydrochloric acid) continuously permeating through the Viton diaphragm over time and reacting with water on the other side of the diaphragm to create hydrochloric acid, which corroded the stainless-steel parts of the pressure gauge to which the gauge guard was attached. [Doc. 1, ¶ 18; *see also* Doc. 94, pp. 22:23—25:22]. The CIP leaked approximately 30 gallons of hydrochloric acid throughout Plaintiff's

facility, destroying the CIP and part of the building in which the CIP was housed. [Doc. 69-1, ¶¶ 21, 22]. Plaintiff alleges that the leak caused approximately $1.8 million in damages. [Doc. 1, ¶ 28].

As a result, Plaintiff filed the instant lawsuit, alleging that the damages to its property were proximately caused by Hayward and Diacom's negligent failure to (1) use due care in the selection of materials for use in acid-contact environments, (2) use due care to avoid causing injury to others, (3) provide accurate and timely information concerning the suitability of their products for acid-contact environments, including the effect of permeability on the useful life of their products, and (4) provide adequate warnings regarding the likelihood that their products would fail over time when used in acid-contact environments. [Doc. 1, ¶ 26]. Plaintiff suggests that the gauge guard should have come with a warning in the form of a label stating the device's expiration date when used with acids. [Doc. 94, p. 97:1–7]. The Court granted summary judgment in favor of Diacom on all of the claims Plaintiff asserted against it. [Doc. 98].

Hayward now moves for summary judgment on all of Plaintiff's claims against it and seeks to exclude the testimony of Plaintiff's expert witness, Dr. Fred Willard. The Court held a hearing on the issues, conducted an extensive review of the record, and now finds as follows.

## DISCUSSION

### A.  Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing

*Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

### B. Design Defect

Plaintiff's first claim charges Hayward with breaching its duty to "use due care in the selection of materials for use in acid-contact environments and applications." [Doc. 1, ¶ 25(a)]. This allegation seems to implicate design-defect liability; however, during the hearing on Defendants' motions, Plaintiff's counsel specifically indicated that this is not a design-defect case. [Doc. 94, p. 92:12–18].[1] Accordingly, Plaintiff has waived any design defect claim that can be inferred from the Complaint, and the Court will not consider any allegations or arguments as to such a claim. To the extent a design-defect claim is present, it is **DISMISSED without prejudice**.

### C. Failure to Warn

Plaintiff argues that the true crux of this case is Hayward's failure to warn of the ability of acids to permeate through the diaphragm in its gauge guards. Generally, "the manufacturer of a product which, to [the manufacturer's] actual or constructive

---

[1] THE COURT:  But y'all [Plaintiff's counsel] aren't arguing there was a design defect? You're not arguing that the diaphragm didn't work like it was supposed to, are you?

MR. BESSHO:  No, Your Honor. I mean, there are some cases that say failure to warn is part of a design issue. But as far as the physical design of the product itself, we agree it functioned as it was designed to function.

knowledge, involves danger to users, has a duty to give warning of such danger." *Fouch v. Bicknell Supply Co.*, 756 S.E.2d 682, 689 (Ga. Ct. App. 2014) (quoting *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994)). This duty extends to "foreseeable dangers arising from the reasonable use for which the product is intended" and requires that the manufacturer "exercise [ ] reasonable care to inform third persons of the dangerous condition or of the facts which make the product likely to become dangerous." *Camden Oil Co. v. Jackson*, 609 S.E.2d 356, 358 (Ga. Ct. App. 2004). Nevertheless, the existence of a duty to warn "depends on the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger," all of which are generally "not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner." *Exxon Corp. v. Jones*, 433 S.E.2d 350, 352 (Ga. Ct. App. 1993) (quoting *Omark Indus. v. Alewine*, 319 S.E.2d 24, 25–26 (Ga. Ct. App. 1984)).

Hayward moves for summary judgment on this claim, arguing that (1) permeation was not the danger at issue in this case; (2) Plaintiff's use of the gauge guard and the injury arising therefrom were not reasonably foreseeable; (3) it had no duty to warn of all potential hazards that may arise from using its gauge guards; (4) it had no duty to warn a sophisticated user of hydrochloric acid such as Plaintiff; (5) it had no duty to warn Plaintiff because Dalworth was a learned intermediary situated between them; (6) Plaintiff's improper installation, inspection, and/or maintenance of the gauge guard was the true proximate cause of Plaintiff's harm; and (7) Plaintiff's failure to read the given

warnings negated Hayward's duty to warn. The Court agrees only with the last of these arguments, as explained in depth below, and therefore grants Hayward's motion for summary judgment.

### 1. The Hazard

First, Hayward argues that permeation cannot be the true danger in this case because it is not dangerous in all situations, but only when it occurs with certain dangerous substances. Ergo, Hayward argues that the danger here was caused by Plaintiff's use of hydrochloric acid, since water, for instance, would not have resulted in the damages Plaintiff incurred. But even where a product may not be inherently dangerous or dangerous in all applications, a Georgia manufacturer has a duty to warn "of the facts which make [its] product likely to *become* dangerous." *Camden Oil*, 609 S.E.2d at 358 (emphasis added). Thus, although permeation may not be dangerous in every instance, Hayward had a duty to disclose facts that would make the permeability of the parts of its gauge guards dangerous so long as those facts were reasonably foreseeable. *Id.*[2]

### 2. Foreseeability of the Harm

Having determined that Hayward had a duty to warn of reasonably foreseeable facts that would make its gauge guards dangerous, the Court turns to the determination

---

[2] The Court also notes that Hayward provides no case law to support its belief that a duty to warn attaches only to those products that are dangerous in every application, and the Court can find none.

of whether Plaintiff's use of hydrochloric acid with Hayward's gauge guard was reasonably foreseeable to Hayward and whether it was reasonably foreseeable that such use would be dangerous. The record evidence shows that Diacom marketed its Viton diaphragms as having "[v]ery low permeability," [Doc. 70-4, p. 21], and that Diacom made the diaphragms to be used in Hayward's gauge guards according to Hayward's design and material specifications, [Stone Depo., pp. 53:21—54:12; Doyle Depo., p. 30:9–25]. It also shows that Hayward published a Chemical Resistance Guide, in which hydrochloric acid with concentrations ranging from 10 to 37 percent is deemed to have an "A" rating—meaning "Excellent, no effect"—when tested on Viton at an "ambient temperature" of 70 degrees Fahrenheit. [Doc. 70-9, p. 47]. Moreover, Hayward's literature states that its gauge guards are intended to "isolate[] and protect[] gauges from the corrosive process media in the piping system." [Doc. 70-10, p. 19]. And, finally, it shows that Hayward has at least some knowledge of permeability. [Doc. 70-10, Stone Depo., p. 175:6—176:2]. From this, a jury could find that Hayward was (or should have been) aware that the Viton diaphragms it designed, ordered from Diacom, and incorporated into its gauge guards were permeable and that its gauge guards would be used with 34% concentrated hydrochloric acid on one side of the diaphragm and gauges[3] susceptible to

---

[3] The Court is aware that the device attached to the gauge guard in this case was a pressure transducer rather than a pressure gauge as depicted in the schematic in the Factual Background. However, the purpose of the devices is generally the same. Compare *Transducer*, Dictionary.com, https://www.dictionary.com/browse/transducer (last visited Feb. 19, 2019) ("a device that receives a signal in the form of one type of energy and converts it to a signal in another form") with *Gauge*, Dictionary.com, https://www.dictionary.com/browse/gauge?s=t (last visited Feb. 19, 2019) ("any device or instrument for measuring,

corrosion on the other. That is, a jury could find that it was foreseeable to Hayward that hydrochloric acid could permeate a diaphragm used in their gauge guard and corrode the corrodible components of the gauge on the other side of the diaphragm, as Plaintiff contends occurred here. Thus, summary judgment cannot be granted on this ground since a jury could find that Hayward had constructive knowledge of Plaintiff's use of the gauge guard and the hazard arising therefrom.

3.   Sophisticated User and Learned Intermediary Doctrines

Even though a jury could find that the hazard here was foreseeable, the existence of a duty to warn does not rest solely on that determination. *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 645 (Ga. 2016). "[A] manufacturer . . . has no duty to warn of a product-connected danger which is obvious or generally known," *Fouch*, 756 S.E.2d at 690, and "[t]here need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession," *Niles v. Board of Regents of Univ. Sys. of Ga.*, 473 S.E.2d 173, 175 (Ga. Ct. App. 1996). Likewise, where a learned intermediary stands between the manufacturer and the end-user of the product, the manufacturer's duty to warn the end-user "can be discharged by a warning given to an intermediary . . . under a balancing test of several factors." *Fouch*, 756 S.E.2d at 691. These factors include "the burden of requiring a warning; the likelihood that the intermediary will provide a

---

registering measurements, or testing something, especially for measuring a dimension, quantity, or mechanical accuracy"). From what the Court can deduce, a gauge merely reads the pressure of its subject, while a transducer reads the pressure and transmits it elsewhere in another form.

warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm." *Id.* (quoting *Carter v. E.I. DuPont de Nemours & Co.*, 456 S.E.2d 661, 664 (Ga. Ct. App. 1995)). The factors apply even where the manufacturer did not actually warn the intermediary but instead relied on the intermediary to forward information it already possessed or of which it had actual prior knowledge. *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563, 1568 (11th Cir. 1989).[4]

Hayward argues that any general duty it owed to warn of the hazards of using its gauge guards with hydrochloric acid were negated by Plaintiff's sophistication in using hydrochloric acid and/or Dalworth's status as an intermediary familiar with hydrochloric acid. The legal premise that absolves a manufacturer of the duty to warn a knowledgeable user is referred to as the "sophisticated user" doctrine, a title that seems to require that the user be well-versed in the *product* that it is using. But the literal language of the doctrine asks whether the user is aware of the *danger* it faces. Hayward argues that Plaintiff is a sophisticated user of hydrochloric acid, an argument that undoubtedly stems from Hayward's belief that hydrochloric acid was the hazard here. *See* Section C(1), *supra*. But because the Court determined that the hazard here was the combination of hydrochloric acid with a permeable barrier and stainless steel, Plaintiff would have had to be a sophisticated user of all of those products to be aware of the danger it faced and

---

[4] The *Carter* court adopted the *Stuckey* analysis as the proper one for assessing learned intermediary arguments. 456 S.E.2d at 663–64 ("We are persuaded that the proper approach to analyzing the application of the 'learned intermediary doctrine in these cases is that applied in *Stuckey* . . . .").

to alleviate Hayward of the duty to warn. That is, Plaintiff must have known of the properties of hydrochloric acid, the diaphragm's permeability, and the corrosive nature of stainless steel. Plaintiff concedes that it is a sophisticated user of hydrochloric acid due to its prevalence in the asphalt emulsion industry. And it can be presumed that this sophistication begets at least the knowledge that stainless steel can be corroded by hydrochloric acid, especially given the previous incident of the acid corroding the stainless-steel pipes of the CIP at Plaintiff's sister plant. Nevertheless, there remains a question of fact as to whether Plaintiff knew of the components of the gauge guard, which were firmly within Hayward's expertise, or the permeability of Viton, which was arguably within Hayward's knowledge (actual or constructive). The result does not change when the Court views the sophisticated user doctrine from an objective perspective. It is up to a jury to determine whether it is generally known in the asphalt emulsion profession that hydrochloric acid can permeate a fluoropolymer barrier and reach stainless steel situated on the other side.

Hayward's reliance on *Niles*, 473 S.E.2d 173, is inapposite. In *Niles*, a Georgia Tech doctoral student who had previously received degrees in chemistry and physics with honors sued Georgia Tech and the University of Georgia Board of Regents after suffering injuries from a laboratory explosion. 473 S.E.2d at 174–75. The student mixed acetone, ethanol, and nitric acid in a metal canister containing titanium isopropoxide residue, which caused the canister to explode and send metal fragments into his leg and abdomen.

*Id.* He claimed that his professor and Georgia Tech should have warned him of the dangers of mixing the chemicals, and the Georgia Court of Appeals disagreed. In its decision, the Court found any duty to warn to be negated by the student's knowledge of the danger and emphasized that the student was well-versed in chemistry and the chemicals he used, that the chemicals were common in laboratories, and that the student had access to information about the chemicals if he needed it, but instead ignored that information and "knowingly took the chance." *Id.* at 175–76.

The most notable difference between *Niles* and this case is that the *Niles* court found the student to be a sophisticated user of *all* of the chemicals that caused his injuries and found that he had a general understanding of (or could have easily deduced) *all* of the chemical interactions that made the explosion possible. Put simply, the *Niles* plaintiff had a near-expert understanding that mixing certain chemicals can result in violent reactions and had resources within his grasp that could have informed him that such a reaction was forthcoming. By contrast, Hayward points to no evidence that a member of the asphalt emulsion profession would know that hydrochloric acid could permeate a Viton diaphragm, particularly when the entire purpose of the gauge guard and its components is to resist corrosive liquids and keep them away from corrodible machinery. Indeed, the undisputed evidence shows that permeation and the characteristics of fluoropolymers are generally unknown to the asphalt emulsion profession. *See* [Doc. 70-14, ¶¶ 4, 6].

Similarly, Hayward's reliance on the principle propounded in *Whirlpool Corp. v. Hurlbut* that "[i]t is not important whether [the plaintiff] knew the precise, physical nature of the hazard present by his 'use' of the product; it is sufficient if he is aware generally that the 'use' being made of the product is dangerous" is inapposite when read in context. 303 S.E.2d 284, 288 (Ga. Ct. App. 1983).[5] The *Whirlpool* plaintiff-appellee was injured in an explosion while using mineral spirits and gasoline to remove carpet backing from a condominium kitchen floor. *Id.* at 285. The pilot lights on a gas stove in the kitchen were burning at the time of the explosion, and during his deposition, the plaintiff-appellee testified that he saw the stove but was not aware that a gas pilot light could ignite chemical vapors; he believed that an explosion could only occur upon direct contact between a source of ignition and the liquid chemicals. *Id.* He also warned the condo owner not to strike a match or smoke in the room while he was working with the chemicals. *Id.*

After the explosion, the plaintiff-appellee sued the condo owner, alleging that she failed to warn him of the existence of the stove and of the pilot lights, and the stove manufacturer, alleging that it failed to warn him of the "latent dangers" associated with its product. *Id.* at 286, 287. The Georgia Court of Appeals reversed the trial court's denial of the defendants' motions for summary judgment, concluding that the plaintiff-appellee

---

[5] Hayward mistakenly cites to *Camden Oil*, 609 S.E.2d 356, for this quote, but it originates from *Whirlpool* and is cited in *Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp.*, 4 F. Supp. 2d 1198, 1203 (S.D. Ga. 1998).

assumed the risk of his injuries because he had actual knowledge that "no source of ignition should have been present in the kitchen while he was working with mineral spirits and gasoline." *Id.* at 288. Moreover, the court found that he was actually aware of the alleged danger because he knew that gas stoves have pilot lights and knew that flames and sparks should have been kept out of the area where he was working with the chemicals. *Id.* at 289 ("The stove's alleged defect, negligent manufacture and design, and inadequate warnings all arise from a product characteristic [i.e., pilot lights] of which appellee had *actual* knowledge.") (emphasis added). Thus, the court reasoned, "appellee clearly knew that it was dangerous to soak the floor adjacent to a gas stove with gasoline and mineral spirits" because he knew the chemicals' exposure to flame would be disastrous, and it did not matter that he was incorrect as to exactly how that disaster would occur. *Id.* at 288.

The glaring difference between *Whirlpool* and the present case is that Hayward's gauge guard was intended to *eliminate* the dangers arising from corrosive chemicals meeting corrodible substances, and a reasonable user of the product would likely not have been aware that their ordinary use of the product would still result in that danger. Further, it cannot be said as a matter of law that Plaintiff assumed the risk of any danger in this case because the alleged lack of warnings arose from a product characteristic [i.e., a permeable diaphragm] of which Hayward has presented no evidence Plaintiff had actual knowledge. Hayward would have the Court stretch the standard in *Whirlpool* to

say that it is unimportant that Plaintiff was unaware that hydrochloric acid would corrode stainless steel through permeation as opposed to direct contact since it was aware of hydrochloric acid's corrosive properties. But to do so would be to ignore the advertised purpose of Hayward's product: to negate chemicals' corrosive properties. In the absence of actual knowledge of the components of the gauge guard and their permeability, Plaintiff cannot be said to have assumed the risk of corrosion by using the product, when the ordinary user of the product[6] would have believed there was no such risk at all.

Hayward's argument that Dalworth was a learned intermediary who cut off any duty Hayward owed to Plaintiff also fails. Hayward contends that Dalworth was knowledgeable about Hayward gauge guards by virtue of using them on "numerous occasions both before and after this incident," including on at least four other identical CIPs manufactured for Plaintiff's parent company. [Doc. 57-1, pp. 17–18]. Hayward also contends that Dalworth was knowledgeable because its president, Darryl Young, repeatedly asked the distributor whether this particular model of gauge guard was appropriate to use with high-concentration hydrochloric acid and reviewed Hayward's Chemical Resistance Guide. [*Id.* at p. 18]. But none of these contentions convey any knowledge on the part of Dalworth about permeation or the fact that the gauge guards would not keep hydrochloric acid completely away from stainless steel. Thus, it cannot

---

[6] The Court has already determined that Plaintiff was not a sophisticated user of gauge guards or Viton diaphragms.

be inferred from this evidence that Dalworth had knowledge of the hazard sufficient to absolve Hayward of a duty to warn.

### 4. Plaintiff's Improper Installation or Maintenance

Hayward's next argument places the blame for Plaintiff's injuries on Plaintiff's purported failure to perform any preventive maintenance on the CIP for the five years between its installation in 2009 and the hydrochloric acid leak in 2014. When a product is sold to " a commercial operator which may reasonably have been expected to be familiar with the dangers resulting from [ ] misuse or neglect" of the product, the manufacturer's failure to warn of such dangers cannot be considered the proximate cause of the operator's injuries because, otherwise, the manufacturer would be required to warn of "every conceivable way in which injury might result from the negligent operation or maintenance of a product." *Exxon Corp.*, 433 S.E.2d at 352–53 (quoting *Omark Indust.*, 319 S.E.2d at 26). Despite Hayward's argument, there is evidence that the only method of maintaining the gauge guard is to watch for external leaks or erratic readings from a gauge attached to the guard, [Stone Depo., pp. 169:1—170:9], which Plaintiff did daily, [Gales Depo., pp. 28:10—31:2]. This evidence, viewed in the light most favorable to Plaintiff, would allow a jury to find that Plaintiff's adequately maintained the product, and Hayward is not entitled to summary judgment based on this argument.

5.    <u>Plaintiff's Failure to Read Provided Warnings</u>

Despite the Court's previous findings, it must agree with Hayward that Plaintiff cannot establish that any failure to warn was the proximate cause of its injuries because it failed to read the warnings actually provided by Hayward with its gauge guards. The Georgia courts recognize two failure-to-warn theories: (1) the insufficient communication of a warning due to its presentation or location when more effective ways of communicating the warning were available and preferable; and (2) the inadequacy of a given warning due to "insufficient, inaccurate or misleading" content, *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 534 (Ga. Ct. App. 1995), that fails to provide a "complete disclosure of the existence and extent of the risk involved," *Thornton v. E.I. DuPont de Nemours & Co.*, 22 F.3d 284, 289 (11th Cir. 1994) (quoting *Pavlides v. Galveston Yacht Basin*, 727 F.2d 330, 338 (5th Cir. 1984)). *See also Key Safety Sys., Inc. v. Bruner*, 780 S.E.2d 389, 392 (Ga. Ct. App. 2015). Ordinarily, causation in failure-to-warn cases is a question for the jury, *id.*, but a plaintiff's failure to read given warnings bars a claim based on the inadequate content of those warnings because even if the warnings had been adequate, the Plaintiff would have neither seen nor acted in accordance with them to avoid the danger, *Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754, 761–62 (Ga. Ct. App. 2016). *See also Powell v. Harsco Corp.*, 433 S.E.2d 608, 610 (Ga. Ct. App. 1993). A plaintiff's failure to read warnings in an insufficient-communication case does not bar his claims, however,

because such a failure can be evidence of the insufficient placement or appearance of the warnings. *Wilson Foods*, 460 S.E.2d at 534.

Hayward characterizes Plaintiff's failure-to-warn claim as one arising under the inadequate-content theory, and the Court agrees. In its Complaint, Plaintiff charges Hayward with failing to "provide accurate and timely information concerning . . . the property of permeability and the effect of such permeability on the useful life of the [gauge guard] when used in acid-contact environments and applications" and failing to "provide adequate and meaningful warnings . . . concerning the likelihood of failure of [the gauge guards] over time when used in acid-contact environments and applications." [Doc. 1, ¶ 26(c), (d)]. The plaintiff in *Wilson Foods* similarly alleged that the defendant failed to "provide an adequate warning so as to alert customers . . . to the dangers inherent in storing cooked grease in its container" and failed to "adequately warn users of its product of the dangers associated with storing cooked or used grease in such containers." 460 S.E.2d at 534. The court determined, as this Court does here, that these allegations stated a claim based on the inadequacy of given warnings. *Id.* Thus, any failure to read the warnings provided by Hayward bars Plaintiff's claim.

The undisputed evidence shows that Hayward shipped each of its gauge guards with an "Installation Operation & Maintenance of Gauge Guards" instruction sheet. [Doc. 57-12, ¶ 12; Doc. 57-13]. Hayward also shipped the gauge guard at issue in this case directly to Plaintiff, who received it. [Doc. 57-6, p. 38; Young Depo., pp. 79:20—81:1].

Despite receiving the gauge guard, Plaintiff offers no evidence to create a genuine issue of material fact as to whether any of its employees read the instructions provided with the gauge guard. Plaintiff merely argues that the Installation Operation & Maintenance instruction sheet is a disclaimer of responsibility rather than a warning.

The instruction sheet contains nine instructions, and the first two appear to be disclaimers.[7] But the instruction sheet also states: "the maximum recommended fluid velocity through any Hayward product is eight feet per second. Higher flow rates can result in possible damage due to the water hammer effect"; "[Hayward products] should NEVER be used or tested with compressible fluids such as compressed air or nitrogen"; "[s]ystems should always be depressurized and drained prior to installing or maintaining Hayward products"; and "DIRECT INSTALLATION OF METAL PIPE INTO PLASTIC CONNECTIONS IS NOT RECOMMENDED." [Doc. 57-13, ¶¶ 3–5, 9] (emphasis in original). Each of these statements is undoubtedly a warning, which is defined as "[t]he pointing out of a danger, especially to one who would not otherwise be aware of it,"

---

[7] They state:

1. Hayward guarantees its products against defective material and workmanship only. Hayward assumes no responsibility for damage or injuries resulting from improper installation, misapplication, or abuse of any product.

2. Hayward assumes no responsibility for damage or injury resulting from chemical incompatibility between its products and the process fluids to which they are subjected. Compatibility charts provided in Hayward literature are based on ambient temperatures of 70F and are for reference only. Customer should always test to determine application suitability.

[Doc. 57-13, ¶¶ 1, 2].

*Warning, Black's Law Dictionary* (10th ed. 2014), and as "notice of a possible danger or problem, so that it can be prevented or avoided," *Warning,* Cambridge Dictionary Online, https://www.dictionary.cambridge.org/us/dictionary/english/warning (last visited Feb. 20, 2019). Plaintiff bases its failure-to-warn claim on Hayward's failure to include a warning about permeability and, in doing so, challenges the adequacy of the content of warnings that were actually provided.[8] Such a claim is defeated by a plaintiff's failure to read the warnings actually provided, and because Plaintiff presents no evidence to create an issue of material fact as to whether it read the given warnings, Hayward is entitled to summary judgment.[9]

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Hayward's Motion for Summary Judgment [Doc. 57] and **DENIES** Hayward's Motion in Limine [Doc. 58] **as moot**.[10] Given this ruling and the Court's previous Order granting summary judgment in favor of

---

[8] It makes no difference that Plaintiff claims there was no warning about permeability at all as opposed to there being a warning about permeability that was not specific or clear enough. In either case, Plaintiff would not have known about the absence or the insufficiency of a permeability warning because it did not read the instruction sheet upon which any such warning would have been placed.

[9] To succeed on its motion for summary judgment, it is sufficient that Hayward points out the absence of evidence to support Plaintiff's case rather than presenting its own affirmative evidence. *See Four Parcels, supra* Section A.

[10] Dr. Fred Willard's expert testimony and report, which Hayward moves to exclude, had no bearing on this Order, except with respect to his opinion as to what caused the CIP to leak hydrochloric acid. Even in the absence of Dr. Willard's testimony, the Court's decision is supported by the testimony of Dr. William Longo, Hayward's expert witness.

Diacom [Doc. 98], the Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants.

      **SO ORDERED**, this 21 day of February, 2019.

**s/Tilman E. Self, III**
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**
